[Civ. No. 19818.   Second Dist., Div. Three.   July 8, 1954.]

SAMUEL BERNSTEIN, Respondent, v. SAMUEL MAIMES, Appellant.

[Civ. No. 19819.   Second Dist., Div. Three.   July 8, 1954.]

BENJAMIN BERNSTEIN, Respondent, v. SAMUEL MAIMES, Appellant.

A. Brigham Rose and Irving Sulmeyer for Appellant.

David Schwartz, Arthur S. Wolpe and Merton L. Schwartz for Respondents.

WOOD (Parker), J.—These two actions for damages for malicious prosecution were consolidated for trial and, in a trial by jury, judgments were for plaintiffs. Defendant appeals from the judgments and the orders denying his motions for new trials.

Plaintiff Samuel Bernstein (referred to herein as Samuel) and defendant Maimes had been acquaintances about 15 years. In the view of the evidence most favorable to plaintiffs, some of the facts are as follows: In 1949, Samuel told Maimes that he intended to open an upholstering business. Maimes, who intended to open a furniture and upholstering business on Pico Boulevard in Los Angeles, suggested that they go into the upholstering part of the business together on a 50-50 basis. The furniture store was to be in the front part of the building and the upholstering department was to be in the rear part. A few days thereafter they had a conversation in which Maimes said they would open the upholstering shop; that Samuel would be the outside man and would produce the business and Maimes would take care of the inside and they would "split half and half." It was also said in that conversation that Samuel would use his own truck in the business and would not charge for the wear and tear expense of it; that Maimes would not charge rent for the upholstering part of the store building; that no expenses would be charged to the upholstering department except the cost of labor and material.

Samuel testified, on cross-examination, that he was the sole producer of the business in the upholstering department and that Maimes was to get 50 per cent of the business produced by Samuel after deducting cost of labor and material.

In May, 1950, they opened the upholstering department for business—as a part of the Maimes Furniture and Upholstering Company (referred to as Maimes Company).

In July, 1950, plaintiff Benjamin Bernstein (referred to herein as Benjamin), who is the brother of Samuel, was employed as a salesman in the upholstering department upon a commission basis of 12 per cent.

Samuel obtained orders for upholstering, and at times Maimes gave him $50 or $80 or $100 but, according to the testimony of Samuel, Maimes never gave him an accounting as to the profits. Samuel testified that he kept insisting on an accounting and that he told Maimes if he did not get an accounting he would leave and open a store of his own; that in January, 1951, after Maimes had failed for 13 weeks to give any figure at all, he (Samuels) left that business, and in February, 1951, he opened an upholstering store in Santa Monica. Benjamin also left the Maimes Company in January, 1951.

While Samuel was at the Maimes Company he obtained orders for upholstering in the approximate amount of $30,000. In taking such orders it was the custom to take them in the name of the company, and it was the custom in paying for the orders to make the checks payable to the company. During the time Samuel was with the company he received orders for upholstery work from a Mrs. Lawson in the amount of approximately $800. In making payments on account of the orders, she gave him five checks which, at his request, were made payable to "cash." The checks were for the total amount of $709.90. He cashed four of the checks (totaling $634.90); and his brother, Benjamin, cashed one of them—the $75 check.

About March 1, 1951, Maimes went to the office of the district attorney and told a deputy district attorney that Samuel and Benjamin had stolen the money which Mrs. Lawson had paid for upholstery work. After conferring with the deputy district attorney (as hereinafter shown in the testimony of the deputy), the deputy told him to see the City Prosecutor of Santa Monica. Maimes then went to the office of the city prosecutor and conferred with him. He issued a complaint charging Samuel with four counts of petty theft and charging Benjamin with one county of petty theft. The complaint was signed by a police officer. The city prosecutor was too ill to appear as a witness in the present case.

On March 13, 1951, Samuel and Benjamin were arrested upon said charges, were put in jail for approximately six hours, and then released on bond. In a trial upon the charges they were acquitted.

The complaints for damages in the two present cases were based upon the prosecution and acquittal in said criminal action. Samuel contended at the trial of the present case that

he was a partner of Maimes in the upholstery business. Maimes contended that Samuel was an employee of the company.

Samuel testified that he paid to Jack Maimes, the son of defendant Maimes, $306 of the money he received from Mrs. Lawson. (Jack is the manager of the Maimes Company.) Samuel also testified that Benjamin cashed the $75 check for Samuel; that he (Samuel) retained money from the Lawson job because he needed it, and in each instance when he took money on that job he told Jack Maimes or defendant Maimes.

Mrs. Lawson, called as a witness by defendant, testified that on August 22, 1950, she ordered certain upholstery work from Samuel; he asked her to make the check "to cash" because he was going to the upholstery material place to buy material and prices were going higher and he had to say, at the door of the place, how many yards he wanted; she complied with his request and made the check for $182.40; on August 23, 1950, she gave him another order with the understanding that the work would be done at a later date; he told her that prices were going higher and that if she would give him the money for the material he would buy it and hold it until time to do the work; he asked her to make the check "to cash"; she complied with his request and made the check for $252.50; on December 15, 1950, he told her that he would like to have $75 for labor and that he would start the work at once; he asked that the check be made "to cash"; she complied with his request and made the check for $75; on February 13, 1951, he told her he wanted $100 for labor and asked that the check be made "to cash"; she complied and gave him a check for $100; on February 16, 1951, at his request, she gave him another check for $100 which was payable "to cash." She also testified that in August, 1950, when she gave Samuel the first order, he wrote the order and gave her a document (customer's yellow copy from the order book—Exhibit B) and the top of it had been torn off (the torn off top contained the name, address, and telephone number of the Maimes Company); that Samuel wrote his telephone number on the document.

Maimes testified that in April, 1950, Samuel came to the building on Pico Boulevard where Maimes was getting ready to open a store and asked for employment as a salesman; Maimes replied that he knew from the way Samuel had transacted business in Detroit he (Maimes) did not care to be associated with him; Samuel said that he would change his way of doing business and Maimes would not have any trouble

with him; Maimes finally said that he would employ him upon a commission of 10 per cent; Samuel said he wanted 12 per cent because he would use his own truck; Maimes replied that he would give him 12 per cent but he wanted it understood that any deposit a customer gave him would be paid to the Maimes Company; there was no change thereafter in the arrangement regarding employment; Samuel did not have a drawing account but occasionally Maimes gave him money in advance, which was to be deducted from his commission when a job was completed; Samuel obtained orders in the amount of approximately $24,000 while he was with the Maimes Company; Maimes never received an order blank from Samuel for the Lawson job; in the latter part of February, 1951, Maimes saw the Lawson order blank (Exhibit B, with the top torn off) at Mrs. Lawson's home; he never received any of the money represented by the five checks signed by Mrs. Lawson; when he showed the five checks to Samuel, he (Samuel) said that he was guilty and that he had taken the money because he wanted to go into business for himself; Maimes presented to the city prosecutor the information Maimes had regarding the Lawson matter; he told the prosecutor the "same thing" he had told the deputy district attorney; the testimony of the deputy district attorney, as to what Maimes told him, was correct; it was at the trial of the criminal case, that Maimes first learned that Samuel claimed to be a partner; he (Maimes) had been convicted of a felony; with reference to notations on several checks which Maimes had drawn in favor of Samuel, the notations "Salesman's expenses" or "Commissions in Full to date" or similar words which are thereon, above the endorsement of Samuel, were not on the checks when the checks were given to Samuel; Maimes wrote those notations above Samuel's endorsement during the trial of the criminal case, after he (Maimes) learned that Samuel was claiming to be his partner; he (Maimes) testified in the criminal case that those notations were on the checks at the time the checks were given to Samuel.

Jack Maimes, called as a witness by defendant, testified that he is manager of the Maimes Company; during May, 1950, Samuels asked Maimes on two occasions, in the presence of Jack, for a job as upholstery salesman; on the second occasion Maimes said he would hire Samuel and pay him a commission of 10 per cent; Samuel asked him to make it 12 per cent; Samuel never reported to Jack that he (Samuel) was deducting money from deposits on upholstery jobs; the

Lawson furniture was not brought to the store under Mrs. Lawson's name; Samuel said the furniture belonged to Mrs. Korchek and Mrs. Brady, that since they had not selected the fabrics he did not have any deposit from them, and he would make out the bills later; Samuel did not tell Jack that he had received any money on the Lawson job; Samuel did not pay any money to him in connection with that job; on February 27, 1951, Jack went to the home of Mrs. Lawson and learned for the first time that the furniture which was in the names of Korchek and Brady actually belonged to Mrs. Lawson; on two occasions Samuel said "[L]et's figure up and see what my commission is"; Jack never heard Samuel ask for an accounting.

Mr. Aggeler, the deputy district attorney, testified that Maimes and Mrs. Lawson came to his office about March 1, 1951; Maimes said that he ran a furniture store and that Sam and Ben Bernstein work for him; Mrs. Lawson had furniture in his store for repairs; Sam had solicited upholstery work from Mrs. Lawson and collected money from her by check and had not turned it in to Maimes Company; Maimes asked Sam about collecting the money and Sam said, "Well, I have stolen your money" and "I am a thief"; ■■■ Maimes said he wanted Sam and Ben Bernstein prosecuted; four checks signed by Mrs. Lawson were presented to him (Mr. Aggeler); he asked Maimes if Sam and Ben were his employees; Maimes replied that they were, and that they were working on a commission basis; he asked Maimes if they were his partners, he replied that they were not; he (deputy) said: "I have had experience . . . where one person claims the other stole from him, and when your prosecution has been started, the fellow who is supposed to have done the stealing turns out to be the other man's partner. . . . Is there anything here of a partnership arrangement, because I don't want to start the ball rolling on a prosecution and have it blow up in my face"; Maimes replied that they were not partners, that they work for him and are his employees; he (deputy) said that since four of the checks were for amounts under $200 he thought it would be better to have four petty theft counts than to have one grand theft count and, for that reason, he would telephone the City Prosecutor of Santa Monica and tell him that he was sending Maimes to see him; then he called the city prosecutor and said he was sending Maimes to see him.

■■■ Appellant contends that as a matter of law there was

probable cause for the prosecution. He refers to several undisputed facts (such as requesting that checks be made payable to cash, cashing the checks, failure to remit all the money, handing Mrs. Lawson a purported copy of order with the top torn off) and asserts that those facts were sufficient as a matter of law to show the existence of probable cause. This contention is not sustainable. There were questions of fact as to whether Samuel was an employee or a partner, whether he told Maimes that he received the money and was applying it on account of money due him, whether the top of the order blank was torn off accidentally in removing the blank from the book, and whether Maimes believed that theft had been committed. The matter of Maimes' good faith in charging theft was brought seriously into question by his testimony in the present case to the effect that he made notations on several checks, above the endorsement signature of Samuel, for the purpose of creating evidence that Samuel was an employee. Under such circumstances it cannot be said that as a matter of law probable cause existed.

Appellant also contends that the evidence shows, as a matter of law, that he did not procure the institution of the criminal proceeding. His argument is that he did not sign the complaint and that the proceeding was instituted by the city prosecutor. "One may be civilly liable for malicious prosecution without personally signing the complaint initiating the criminal proceeding." (*Centers* v. *Dollar Markets,* 99 Cal.App.2d 534, 544 [222 P.2d 136].) It was also said on page 544 of the case just cited: " '[T]he test of liability in an action for malicious prosecution is whether the defendant was actively instrumental or was the proximate and efficient cause of maliciously putting the law in motion.' " It was a question of fact as to whether appellant procured the prosecution. The evidence was sufficient to support the implied finding of the jury that he did procure the prosecution. This contention is not sustainable.

Appellant also contends that the court erred in refusing to give two instructions, requested by appellant, regarding advice of counsel to the effect that it is a defense in a malicious prosecution action if the defendant acted in good faith upon the advice of counsel after having made a full and fair statement of the facts of the case to the counsel. This contention is not sustainable. The evidence does not show that Mr. Aggeler, the deputy district attorney, gave Maimes advice as to whether a criminal proceeding should be com-

menced. The deputy district attorney merely told him to see the city prosecutor. There was testimony by Maimes that he told the city prosecutor the "same thing" he had told the deputy district attorney, but there is no evidence as to what the prosecutor told Maimes. It was stipulated that the prosecutor was too ill to be a witness. Since there was no evidence that appellant was advised by counsel, the court was not required to give an instruction regarding advice of counsel.

Appellant also contends that the court erred in sustaining plaintiffs' objection to his offer in evidence of a letter (defendant's Exhibit M for identification) which purportedly was written by the city prosecutor. The letter, dated March 13, 1951, and addressed to Maimes, stated in part: "This office has reviewed the activities of the above subjects [Sam and Ben Bernstein]. . . . As a result of our investigation, we are preparing to file a criminal complaint against Sam Bernestine and Ben Bernestine, charging four counts and one count respectively of petty theft from you. . . . J. Leroy Irwin Deputy City Attorney City Prosecutor." Appellant argues that the statement therein which begins with the words "As a result of our investigation" shows that the city prosecutor instituted the criminal proceeding on his own initiative and that there was no pressure by appellant. The objection to the offer of the letter was sustained on the ground that the letter was hearsay. There was no evidence as to the authenticity of the letter. The court did not err in sustaining the objection.

Appellant contends further that the court gave an inaccurate instruction. The instruction so referred to is set forth below.[1] Appellant's counsel asserts that the instruction "is false in stating that defendant did cause the complaint to be issued." Contrary to that charge of falsity by Mr. Rose (counsel for appellant), the record does show that defendant said that he caused the prosecution and the issuance of the complaint. Appellant's counsel at the trial (Mr. McCarthy) asked appellant the following question: "At the time that

---

[1] "In this case the defendant has stated that he related all the facts which were the basis of the criminal proceeding against the plaintiffs, to the City Attorney, and that he did, in fact, cause the complaint to be issued. If you find that in causing the issuance of a criminal complaint against the plaintiffs that the defendant made false and incorrect statements, or intentionally withheld material facts relating to the alleged offense of the plaintiffs, this may be considered by you in determining whether or not there was a lack of probable cause."

you caused the prosecution of Sam and Ben Bernstein, did you believe that they had embezzled your money?'' Appellant answered: ''I knew it.'' Thereafter the question was read and appellant's counsel said: ''I am referring now to when you caused the issuance of the complaint through the City Prosecutor's office.'' Appellant then said: ''I knew it, yes.'' Thereafter his counsel asked: ''Then at that time that you caused the complaint to be issued through the City Prosecutor's office—I assume it was in March, 1951——.'' Appellant said: ''Yes, it was in March.'' It thus appears that the said statement in the instruction was not inaccurate.

Appellant contends further that the court erred in permitting the jury to pass on the issue of probable cause. He argues that the question of probable cause is one of law to be determined by the court; and that the opinion of the jury as to the existence of facts involved in the determination of probable cause may be obtained (1) by use of the special verdict or (2) by submitting ''the question of probable cause to the jury with hypothetical instructions as to what facts in the particular case do or do not amount to probable cause.'' At the trial the appellant did not request the use of the special verdict, as now suggested; nor did he request instructions embodying such hypothetical matters, as now suggested by him. ██ ''When the evidence bearing on the question of probable cause is in conflict, it is the province of the jury to determine whether facts exist which will warrant or reject an inference of probable cause. However, if there is no dispute concerning the existence of the facts relied on to show want of probable cause, the trial judge must then determine, as a matter of law, whether such undisputed facts do, or do not, warrant an inference of want of probable cause.'' (*Centers* v. *Dollar Markets, supra,* 99 Cal.App.2d 534, 541.) The court herein gave an instruction that plaintiffs must prove, by a preponderance of the evidence, that defendant was guilty of malice and was without probable cause in prosecuting the plaintiffs. It also gave instructions as shown below.[2] A notation at the bottom of the instructions is

___

[2] ''Probable cause is defined under our law as a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.

''Probable cause for the institution of an action does not mean legal cause therefor, but only an honest suspicion or belief on the part of the instigator thereof, founded upon facts sufficiently strong to warrant a reasonable man in believing that such action is proper.

''What is or is not probable cause is measured and determined by the

"Requested by Defendant Given as Modified." The modifications were not materially significant.[3] It thus appears that appellant (defendant) requested instructions which are the kind of instructions that he now asserts should not have been given. The instructions, so requested by him, were given after being modified in minor respects. ▮ Appellant cannot complain of an instructions given at his request. (*Bivens* v. *Haber*, 105 Cal.App.2d 628, 629 [233 P.2d 923].) In *Siffert* v. *McDowell*, 103 Cal.App.2d 373 [229 P.2d 388], which was for damages for malicious prosecution, the trial court, at the request of defendant, gave an instruction properly defining probable cause and other elements of malicious prosecution. Upon appeal by defendant therein, defendant contended that probable cause was not a question of fact for the jury but was one of law for the court. The court on appeal said (p. 377) : "With only minor changes appellants' requested instructions on probable cause, etc., were given by the trial court. These instructions embraced proper definitions and explanations of the elements of malicious prosecution which were to be applied by the jury to the facts in

---

usual and common standard of human judgment and conduct, the true test being whether or not a reasonable man, possessing all of the information within the knowledge of the prosecutor, would be justified in entertaining the suspicion that the charge is true, and this measure of the knowledge of the prosecutor must be applied as of the time that the prosecution was instituted, and, in addition, it must be shown that the prosecutor did at the time he verified the criminal complaint actually believe that the crime charged had been actually committed by the accused."

"It is not necessary that the prosecuting witness shall institute an investigation of the crime itself, or seek to ascertain whether there are other facts relating to the offense, or try to find out whether the accused has any defense to the charge; nor is he required to exhaust all sources of information bearing upon the facts which have come to his knowledge."

"It is the policy of the law that, whenever a citizen shall have reasonable cause to believe that a crime has been committed, he shall be protected in his efforts to secure the punishment of the offender, and he is not to be mulcted in damages, because the defendant is able at the trial to establish his innocence, if he caused the arrest in good faith and without malice, and the facts within his knowledge were of such a character as to induce in the mind of a reasonable man the honest belief that a crime was committed."

[3]Prior to modification, the first instruction referred to below contained a first paragraph which was as follows: "You are instructed that if the defendant Sam Maimes had probable cause to support the prosecution of the plaintiffs Sam Bernstein and Ben Bernstein then your verdict must be for the defendant Sam Maimes." The modification consisted of: (1) striking out said first paragraph; (2) striking out the words "follows: Probable cause may be defined as" which were in the second paragraph, line one, after the word "as"; and, in the second instruction referred to below, changing the words "prosecutrix" and "she" to "prosecutor" and "he."

evidence.'' The evidence herein regarding probable cause was conflicting and the determination of the question of probable cause was for the jury. The instructions as to probable cause were adequate.

■ Appellant also contends that the amounts of damages awarded were excessive. Judgment for Samuel was for $9,115 and judgment for Benjamin was for $2,300. They were arrested in their store in Santa Monica in the presence of customers and were taken to the police station where they were fingerprinted, photographed, and kept in jail for approximately six hours, and then were released on bonds. The trial of the criminal case was commenced on March 28, 1951, and extended over a period of two weeks. Samuel testified that prior to the arrest he had had tuberculosis and that after the arrest the tuberculosis was reactivated; he was not able to become active in business again until two months after the criminal trial; during the time he was absent from his business he did not earn anything but he kept an upholsterer and a seamstress on his payroll and paid them $125 and $67 a week respectively; he became obligated to pay $1,400 for attorney's fees; he paid $140 to a court reporter and $75 for a bond; the arrest and prosecution caused him humiliation and embarrassment. ■ Benjamin testified that prior to his arrest his earnings were about $75 a week; after his arrest he was unable to attend to business for approximately six weeks and he received no income during this period; when he returned to work his earnings were about $35 a week; he paid $250 for attorney's fees and $50 for a bond; the arrest and prosecution caused him to be very upset. The amounts awarded as damages were not excessive.

Appellant also contends that the court erred in denying his motions for new trials. In support of his motion for a new trial, appellant filed an affidavit wherein he stated that since the rendering of the verdict on October 9, 1952, affiant has discovered written evidence which could not, with reasonable diligence, have been produced at the trial; a part of the written document is in the handwriting of plaintiff (Samuel), and a photostatic copy of the document is attached to the affidavit; the document was found on October 11, 1952; affiant knew of its existence before the trial and diligently searched for it but was unable to find it until after the verdict; that all the writing on the photostatic copy is in the handwriting of plaintiff, except the dates opposite the amounts of money and except the words: ''The above 10 customers'

commissions refigured and all paid in full.''; the word ''Sam'' on the exhibit is in the handwriting of plaintiff; the document would have been material evidence to prove that plaintiff was not a partner but was an employee; the names listed on the exhibit represent customers of defendant and were obtained by plaintiff while he was an employee of defendant; if a new trial is granted plaintiff will produce the original of the exhibit.

In opposition to said motion, plaintiff filed an affidavit stating, among other things, that said document was given to defendant by plaintiff prior to the opening of defendant's books so that defendant could have a record of sales made by plaintiff; at the time the document was given to defendant the words: ''The above ten customers commissions refigured and all paid in full'' did not appear on said document, nor were the dates on said document.

Appellant argues that the court abused its discretion in refusing to admit such newly discovered evidence. The evidence was admitted on the motion.　　　　 The said affidavits show that there was a sharp conflict in the evidence as to the authenticity of the writing. Also, there was a meager showing as to the exercise of due diligence in an effort to produce the writing at the trial. In any event, the evidence would have been cumulative. There was no abuse of discretion in denying the motions.

Other contentions on appeal do not require discussion.

The judgments are affirmed. The purported appeals from the orders denying motions for new trials are dismissed.

Shinn, P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 2, 1954.