[Civ. No. 22218.    Second Dist., Div. Three.    Feb. 20, 1958.]

THOMAS P. GONZALEZ, Appellant, v. SOUTHERN PACIFIC COMPANY et al., Respondents.

McBain & Morgan and Newell & Chester for Appellant.

E. D. Yeomans, E. L. H. Bissinger, Walt A. Steiger and Roger M. Sullivan for Respondents.

SHINN, P. J.—The present action was brought by Gonzalez against the Southern Pacific Company and its subsidiary, Inter-California Railway Company, for reimbursement for losses sustained in the shipment of seed garbanzos from Navajoa in Lower California to and across the international boundary into the United States. The shipment was seized by the Mexican customs authorities at Algodones, a railway point on the border some 52 miles east of Mexicali. The reason for the seizure was the belief, much later decided to be in error by the Mexican Fiscal Court, that the defendant railroads were attempting to cross the border with the cars without clearing with Mexican customs. By the time the merchandise was released to plaintiff the garbanzos had become unfit for planting, were disposed of at a greatly depreciated price and plaintiff suffered further detriment through the payment of demurrage charges of the railroads, export duties to the Mexican Government and legal and other expenses in an endeavor to recover his property. The defendants answered, denying the material allegations of the complaint. In a court trial findings and judgment were in favor of defendants; plaintiff appeals.

The garbanzos were grown in the Navajoa area in the State of Sonora. Gonzales undertook to ship approximately 300 metric tons from Navajoa to Tijuana, Mexico, by rail and from Tijuana to Ensenada by truck. Had he succeeded they would have been sold in Ensenada without payment of export duty. Gonzalez paid the growers $47,552.27 for the seeds and the purchasers in Ensenada had agreed to pay him $100,350.

The garbanzos were loaded at Navajoa on cars of Ferrocarril Sud-Mexican del Pacifico which transported them to Pascualitos; from that point transportation to Mexicali would be via Sonora-Baja California Railroad Company, the last 50 miles

of the trip being over the tracks of Inter-California Railway Company. At Mexicali the shipment would be taken across the international boundary to Calexico via Inter-California Railway Company; from Calexico it would go to El Centro by Southern Pacific; from El Centro to Tijuana via San Diego and Arizona and Eastern Railway Company and Tijuana and Techate Railroad Company. At Mexicali the shipment would be transferred to freight cars that had passed inspection by the United States Department of Agriculture, since it would travel through United States territory for a portion of the journey between Calexico and Tijuana. A Mr. Schoen was plaintiff's agent and field representative. By his arrangement, six cars were loaded by Ferrocarril at Navajoa. Bills of lading to plaintiff were issued March 10 and 11, 1949. The shipment was consigned to the order of plaintiff with notification to be given to J. F. Gonzalez and Company. The bills of lading noted that the freight was paid to Benjamin Hill Station where freight was to be collected to Mexicali. Inter-California did not accept a bill of lading to a point beyond the international boundary line. The bills of lading were endorsed by Gonzalez and delivered to Necoechea and Martinez, his Mexican customs brokers in Mexicali. On or about March 15, Mr. Schoen arranged with Mr. Galaz, station agent of Inter-California at Mexicali, for six empty box cars which had passed inspection by the United States Department of Agriculture. He executed a written order for the American freight cars indicating that the destination was Tijuana. Because of the crowded condition of the tracks at Mexicali it was arranged by Galaz that the loading of the cars would be made at Packard, a siding about four miles southeast of Mexicali. One of the cars from Navajoa arrived in Mexicali on March 15 and moved to Packard on March 17; the others arrived March 17 and moved to Packard on March 18. Bills of lading covering the movements to Packard were executed by Mr. Schoen. At Packard the garbanzos were loaded from the cars in which they had originated at Navajoa into the six empty box cars ordered by Schoen. The loading took place March 18 and 19. A Mr. Maldonado was the conductor of Inter-California's train numbered 357 or 358, which moves from Mexicali to Los Algodones and back, a distance of some 52 miles. On the afternoon of March 19, Maldonado caused the six American cars to be moved from Packard back to Mexicali, thinking they were fully loaded, which was not the case. Schoen learned the cars were only partially loaded and

on the morning of March 22, he contacted a Mr. Limon, who was in charge of Inter-California's yard operations in Mexicali and requested him to return the cars to Packard to complete the loading. The movement was accomplished later that day by Inter-California's train No. 358.

The following day, March 23, Maldonado received telephone instructions from Mr. Polkinhorn, a customs broker at Mexicali, to move the six cars from Packard to Los Algodones, which is situated at the international boundary directly across from Cantu on the American side. This direction was given after a conversation between Polkinhorn, Schoen and one Araiza, Inter-California's agent at Mexicali, to be referred to later. Maldonado moved the cars to Los Algodones and placed them on the house track adjacent to the railroad station, some 300 feet from the boundary.

At about 1 p. m., on March 23, Jesus Trajos, an employe of Polkinhorn, presented to Luis Rangel, Inter-California's agent at Los Algodones, United States Customs papers authorizing the movement of the six carloads of garbanzos from Los Algodones into the United States. Trajos had no clearance forms from the Mexican Customs officials. He told Rangel that he represented Gonzalez, that he wanted the cars moved across the boundary that night, and that he had to make immediate arrangements with the Mexican Customs authorities because the office closed at 2 p. m. Although the rules of Inter-California forbade him to order the movement of goods across the international boundary without prior clearance from the Mexican officials, Rangel telephoned the chief dispatcher at Mexicali and ordered him to have the cars moved to the American side.

That evening, the chief dispatcher telegraphed Mr. Hyams, who was the conductor of Southern Pacific's freight train operating between El Centro and Yuma over the tracks of Inter-California between Algodones and Mexicali, and instructed Hyams to pick up the cars at Los Algodones and move them across the boundary at that point. The train left El Centro at 9 p. m. and arrived at Los Algodones shortly before midnight. Pursuant to Hyams' instructions, the crew coupled the six cars onto the Southern Pacific train and moved them from the house track to the international line. Meanwhile, Hyams went to the Mexican Customs House to obtain a clearance. It is sufficient to say at this point that there were no papers furnished Mexican Customs and that the cars were

put back onto the house track. They were not taken across the boundary into the United States.

The apparent attempt to move the six cars across the boundary without proper clearance aroused the suspicions of the Mexican Customs officials and the cars were impounded on March 24, pending an investigation. The garbanzos were taken to a siding near Los Algodones where they remained under guard until August 30, 1949, when they were released to Gonzalez. Meanwhile, the time for planting garbanzo seeds in the Ensenada area had passed and the garbanzos had been rendered unfit for seed purposes due to the intense heat in Los Algondones.

There was evidence that Gonzalez sold the garbanzos in the United States for food purposes for a gross price of $69,300, less additional freight and brokerage charges of $14,996.59, which reduced his net salvage to $54,303.41; his loss of gross receipts was $46,046.59. Since the garbanzos were sold in the United States, Gonzalez was required to pay Mexican export duties amounting to $25,035.12; he also incurred litigation expenses of $20,378.04 in obtaining a judicial clearance from the Mexican Fiscal Court and paid $4,316 to Inter-California under protest as demurrage charges for storage of the garbanzos between March and August 1949. The total damage claimed by Gonzalez was $95,775.75.

The principal questions presented to us for decision are the following: (1) Was there a contract to deliver the shipment to Mexicali for export at that point? (2) Was the diversion of the shipment to Algodones unauthorized by plaintiff? (3) Was the applicable statute of limitations that of the laws of Mexico or the laws of California?

With respect to the first question we shall assume that there was a contract to deliver the shipment to Mexicali. It is not a decisive question and it does not require discussion.

The crucial question is the second one, namely, whether the shipment was diverted by defendants to Algodones without the consent of plaintiff. Defendants' witness, Maldonado, testified that he received instructions from Polkinhorn to take the cars to Algodones. This testimony was received over the objection of plaintiff that it was not shown that Polkinhorn had authority to control the routing of the shipment, but on the contrary it was shown by the evidence that he had no such authority. He was employed for the single purpose of arranging with United States Customs for the receipt of the goods into California at Mexicali. Plaintiff testified that

Polkinhorn was employed for no other purpose and had nothing whatever to do with the routing of the shipment; Schoen was plaintiff's agent for that purpose.

We may agree with plaintiff that there was no competent evidence that Polkinhorn was authorized by the terms of his employment as customs broker to cause the cars to be diverted from Packard to Algodones, and that any statements he may have made would be incompetent to establish the scope of his agency. Had there been no evidence of Polkinhorn's authority other than the above, plaintiff's objection to evidence of statements to Maldonado should have been sustained. However, the circumstances in evidence presented the question whether Polkinhorn in giving instructions to Maldonado was acting with the knowledge and consent of Schoen. The evidence was that defendants knew and recognized the fact that Schoen had authority to arrange for and control the shipment. Maldonado testified that when Polkinhorn gave him instructions to move the cars, he stated that he was acting on behalf of Gonzalez and Schoen. As previously stated, Mr. Schoen had arranged to have six American box cars sent to Packard to be loaded. When he discovered that they had been brought back to Mexicali, not fully loaded, he had them returned to Packard. Ruben Araiza was station accountant of Inter-California at Mexicali. While the six cars were at Mexicali Araiza had a conversation with Polkinhorn and Schoen in front of his office. He testified by deposition that "sometimes Polkinhorn and sometimes Schoen would ask questions." Polkinhorn asked if the railway company could move freight from Algodones to Cantu, stating that he had some freight to move; "they said they had some cars, but they didn't say how many cars or anything like that." Araiza answered "we could move freight from Algodones to Cantu, provided we had the customs clearance." Araiza also testified that Polkinhorn explained to Schoen what would be required, namely, the same papers that were required to move freight from Mexicali to Calexico; freight was seldom moved from Algodones to Cantu. Araiza then had way bills for six cars of garbanzos issued by Ferrocarril Sonora, which showed Mexicali as their destination. The testimony of Maldonado related to a time subsequent to the conversation just mentioned. According to Maldonado, Polkinhorn told him that he wanted to get the cars to Algodones "in a limited time" and stated that they were to be billed in the name of J. F. Gonzalez, J. Chong. Maldonado wrote these names in his day book, writing "Chong" for Schoen, and made out a way bill

for the cars, which he turned into the railway's agent at Algodones. Maldonado had previously received directions from Schoen with respect to the earlier movement of the cars. Defendant's conductor, Hyams, whose train ran between El Centro and Yuma and was scheduled to pick up the cars at Algodones and take them to Cantu, testified that he had received his orders from the chief dispatcher at Mexicali. His train arrived at Algodones around 11:30 p. m.; he identified the cars on the house track and inquired of Diaz, the Mexican Customs officer, whether he had papers covering the cars and learned that Diaz had none; he went across the line to find out about the American papers and discussed them with the customs officer, Mr. Miller, at the latter's office. Present were Polkinhorn and Schoen. Hyams was informed by Miller that the papers were in order with respect to American Customs. Hyams asked Polkinhorn to go across and get the papers for clearance with Mexican Customs and Polkinhorn answered that they had a man there taking care of it. Hyams went over and asked Diaz to wake up the chief of Customs, Cristo, which Diaz did. Cristo appeared and said "The cars can't move." Hyams then reported to Polkinhorn and Schoen that the papers were not ready and that he could not wait any longer. Schoen then said, "Well, everything is alright," and Hyams replied "No, everything isn't alright, until I see them papers." Hyams then put the cars back on the house track; they did not at any time cross the border, which was some 300 feet away. This was the testimony with respect to the critical question whether any authorized agent of plaintiff ordered or advisedly acquiesced in the movement of the cars from Packard to Algodones. Neither Polkinhorn nor Schoen was called as a witness, nor does the record disclose that any reason was stated by plaintiff for failure to call them, or to take their testimony by deposition.

The court found that it was not true that the cars were diverted to Algodones without the consent of plaintiff, and since plaintiff himself had no part in the transaction and Polkinhorn was not shown to have necessary authority, the finding implies either that the movement of the cars to Algodones was under directions given by Schoen to Polkinhorn, to be relayed to Maldonado, or that Schoen, knowing Maldonado was being given the instructions, consented either expressly or by his failure to object. That Schoen and Polkinhorn were considering sending the cars to Algodones appeared from the testimony of Araiza. There was the addi-

tional circumstance that both Polkinhorn and Schoen went to Algodones for the purpose of accomplishing the movement of the cars into California. The failure to accomplish this purpose was due to the fact that although the papers necessary for the Mexican Customs officials had been placed in the hands of Necoechea and Martinez at Mexicali, none had been furnished to the customs officials at Algodones. We think it is clear from these facts that the court could reasonably have inferred that Polkinhorn telephoned instructions to Maldonado with the knowledge and consent of Schoen, and not upon his own responsibility. There would have been no reason for the two men to go to Cantu if they had not known that the cars were being taken there, and there was no apparent reason for their having that knowledge if directions had not been given to Maldonado in the manner described by the latter. There was no apparent reason for Maldonado's taking the cars to Algodones if he had not received directions to do so. Maldonado knew that Schoen was plaintiff's agent; he had previously acted upon instructions from Schoen with respect to earlier movements of the cars. The fact that Maldonado entered in his day book "J. Chong," for Schoen, indicated that he believed Polkinhorn was telephoning on behalf of Schoen and with the latter's consent.

The reasonableness of the inference that Schoen authorized the diversion of the shipment was strengthened by the failure of plaintiff to furnish the court with the testimony of either Polkinhorn or Schoen. If their testimony had not been available plaintiff should have disclosed that fact. Ordinarily, it would have been presumed that their testimony, if given, would have been adverse to plaintiff. (Code Civ. Proc., § 1963, subd. 5; *Breland* v. *Traylor Eng. etc. Co.,* 52 Cal.App.2d 415, 425-426 [126 P.2d 455], and cases cited; *Logan* v. *Andrews,* 25 Cal.App.2d 683, 690-691 [78 P.2d 748] ; *Simpson* v. *Bergmann,* 125 Cal.App. 1, 9 [13 P.2d 531].) The trial court could only assume that if they had testified neither would have contradicted the testimony of Araiza, Maldonado or Hyams. At the conclusion of Hyams' direct examination, he was not cross-examined by plaintiff, and counsel stated "Your Honor, I think I won't ask any questions. There is nothing that concerns our phase of the case that would be substantial disagreement with Mr. Hyams, so he can be excused as far as I am concerned."

In view of the foregoing it was not error to receive the testimony of Maldonado with respect to the instructions he

had received. It cannot be determined as a matter of law that the cars were moved to Algodones other than with the consent and under the direction of Schoen acting within his authority as plaintiff's agent.

The question whether the applicable statute of limitations was that of the laws of Mexico or of California has been ably briefed by counsel, but in our disposition of the appeal we do not find it necessary to decide that question.

Upon the findings which have substantial support in the evidence, the judgment in favor of defendants must be affirmed.

The judgment is affirmed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied March 12, 1958, and appellant's petition for a hearing by the Supreme Court was denied April 16, 1958.