[Civ. No. 22539. Second Dist., Div. Three. June 16, 1958.]

JOHN MASTERSON et al., Respondents, v. PIG'N WHISTLE CORPORATION (a Corporation) et al., Appellants.

George J. Hider for Appellants.

Fendler & Lerner, Harold A. Fendler and Don Lowry for Respondents.

SHINN, P. J.—The plaintiffs in this action are John Masterson, John Reddy and John Nelson, suing individually and as partners doing business under the partnership name of Masterson, Reddy and Nelson. The defendants are Pig'n Whistle Corporation and two of its officers and directors, John E. Savage, President, and August J. O'Connor, Secretary. The action is for damages for malicious prosecution of a suit for breach of contract. In a jury trial, plaintiffs were awarded damages against all defendants in the sum of $48,341.29. Defendants appeal from the judgment entered upon the verdict and the denial of their motion for judgment notwithstanding the verdict.

In the fall of 1950, plaintiffs were engaged in the business of originating, producing and distributing radio and television programs in the Los Angeles area. They developed a television show called "Animal Fair," featuring trained animals, and offered it to Ad Associates, Pig'n Whistle's authorized advertising agency, for sponsorship by the corporation. Negotiations were carried on between John Nelson, on behalf of the partnership, and Gordon Horney, representing the agency. On October 31, 1950, the board of directors of Pig'n Whistle passed a resolution authorizing the sponsorship of "Animal Fair" for a period of 13 weeks, on condition that Pig'n Whistle have a "preferential right for renewal for additional thirteen weeks on the same station, for the same hour and program."

The following day, November 1, Pig'n Whistle agreed to sponsor "Animal Fair" in the Los Angeles area, the program to be broadcast over Station KNBH on Wednesday nights from 7 to 7:30 p.m. for a period of 13 successive weeks, commencing November 8, 1950, at a production cost to Pig'n Whistle of $450 a week for the first six weeks and $600 a week for the remaining seven weeks. The agreement consisted of a typewritten advertising order signed by Horney, containing the above provisions, and a two-page letter agreement subscribed by Horney, Nelson and Savage, whereby plaintiffs undertook to produce the program and to provide suitable scripts and performers for each show. At the foot of the order, under the heading "Special Instructions," appeared the following: "It is understood Ad Associates has the option

to renew this agreement for a successive 13-week cycle at $600.00 per week.'' (The sums to be paid Masterson, Reddy & Nelson were separate and apart from the cost of air time, for which Pig'n Whistle agreed to pay the station $600 a week.

On December 20, Nelson sent Horney a letter ''to confirm our verbal understanding as regards our program ANIMAL FAIR currently on KNBH, 7:00-7:30 PM Wednesday nights.'' We have set forth the letter in the margin.[1]

On January 31, 1951, Variety, a daily newspaper devoted to news of the entertainment world, announced that the Ralston Purina Company was scheduling a new television show called ''Pets and Pals Animal Fair,'' to be broadcast over 62 stations in the American Broadcasting Company television network, commencing March 4 or 11. The article referred to the show as a ''Masterson-Reddy-Nelson package.''

The next day, February 1, the board of directors of Pig'n Whistle authorized renewal of ''Animal Fair'' for the additional 13-week period contemplated in the November 1 agreement. On February 13, Horney sent plaintiffs a typewritten advertising order, headed ''Confirmation of Agreement''; the order renewed Pig'n Whistle's sponsorship for a 13-week cycle ending May 2. The order also provided: ''It is understood Ad Associates has the option to renew this agreement for a successive 13-week cycle at $600.00 per week.'' Three days later, Horney sent plaintiffs the following telegram: ''Client and myself feel disposed to protect rights to use of Pets and Pals Animal Fair name and format.''

Nelson replied to Horney by letter dated February 23, accepting, on behalf of the partnership, renewal of the order until May 2. However, with respect to the request for an option for a third 13-week period, Nelson wrote: ''I am afraid

---

[1] ''Dear Gordon:

''This is to confirm our verbal understanding as regards our program ANIMAL FAIR currently on KNBH, 7:00-7:30 PM Wednesday nights. Under the terms of our present contract and agreement, as long as the program is sponsored by Pig'n Whistle, we grant this client the exclusive right to sponsor the program in the Los Angeles area only. It is further understood by both parties that whatever rights the client or station may have in the program may not be assigned or transferred. Also, it is clearly understood that the format, tit˜e and all rights in this program are the property of Masterson, Reddy & Nelson and revert automatically to us when and if the Pig'n Whistle gives notice of cancellation. This, of course, is what you have always understood but we feel we should put this in writing. Will you please sign the attached copy in the space provided for your signature and return it to me.''

that, in view of the confused state of affairs at present, we cannot go along with you in that, at this time."

Meanwhile, John Masterson had been negotiating with the Gardner Advertising Company with a view toward sponsorship of "Animal Fair" on a national basis by Gardner's client, the Ralston Purina Company. These negotiations commenced in December 1950. On February 28, 1951, plaintiffs entered into a written contract with Gardner to produce "Animal Fair," to be retitled "Your Pet Parade," over the American Broadcasting Company television network. The contract was to extend for five years, divided into consecutive 13-week cycles, and was cancellable by Gardner upon written notice given at least 35 days prior to the last scheduled broadcast date in any 13-week cycle. Plaintiffs were to receive $3,400 a week during the initial cycle, and thereafter were to receive payments on a graduated scale rising to $6,800 a week during the last year of the contract. The agreement with Gardner also provided that plaintiffs were to furnish: "The exclusive television rights in and to the program, and the right to telecast the same throughout the United States, except in Los Angeles, California, where Producer shall have the right to continue the current broadcasting of the program series until Producer arranges for the discontinuance or other disposition thereof."

The first broadcast of "Your Pet Parade" was scheduled for Sunday, March 11. On March 16, Nelson sent a letter to Horney, informing him that "our present contract commitments require us to terminate our arrangement with you, at the earliest possible date" and in replying to the request for a third series that "it will not be possible for us to present the show for you after the completion of the present cycle." Nelson also wrote: "Frankly, the Agency of the national sponsor of 'Your Pet Parade' was reluctant to enter into any deal that did not give it an immediate exclusive throughout the country. It was only after considerable discussion that we were able to persuade the Agency to go along with us at all. Since it was to our own interest to continue with you, we naturally made every effort to obtain an arrangement whereby the two programs could be broadcast, concurrently, but that just wasn't possible. In view of the above you will appreciate that our arrangement will end with the 26th program; that is after the program of May 2, 1951."

April 2, 1951, O'Connor sent a letter to plaintiffs, signing

it in his capacity as Secretary of Pig'n Whistle. We have set forth the letter in the margin.[2]

A meeting of the board of directors of Pig'n Whistle was held the following day, April 3. According to the minutes of the meeting, Savage reported that, in his opinion, plaintiffs were seeking to deprive the corporation "of its exclusive rights of the showing of this television show in violation of its agreement." O'Connor told the board that: "It appeared that on November 1, 1950 the Pig'n Whistle had entered into a written contract with Masterson, Reddy & Nelson for the exclusive right to show this television show in the metropolitan area of Los Angeles with the right to the exclusive showing of this show for successive periods of thirteen weeks so long as the Pig'n Whistle Corporation desired to do so. . . ." O'Connor stated, further, that plaintiffs did not intend to renew the contract for a third cycle of 13 weeks and that they had entered into an agreement with the Ralston Purina Company to show "Animal Fair" or a similar program in the Los Angeles area. He informed the board that he had written to plaintiffs, advising them of Pig'n Whistle's intention to protect its right to the exclusive showing of "Animal Fair." The board thereupon passed a resolution authorizing O'Connor, as attorney for the corporation, to take whatever

---

[2] "Gentlemen:

"Pig'n Whistle Corporation has a contract with you dated November 1, 1950 for the exclusive showing of 'Animal Fair' so long as it elects to sponsor same. You acknowledged this agreement by letter dated December 20, 1950.

" 'Under the terms of our present contract and agreement, as long as the program is sponsored by Pig'n Whistle, we grant this client the exclusive right to sponsor the program etc.'

"In that letter you further point out that neither party to the agreement can assign or transfer their rights and state that the rights and title of Masterson, Reddy & Nelson in the program upon cancellation by Pig'n Whistle reverts to Masterson, Reddy & Nelson. As you know, there has been no cancellation by Pig'n Whistle. We are informed that you have breached this contract because some other person is in a position to pay you more money therefor and that it is your intention to grant this new client exclusive rights to the showing of this particular program in this metropolitan area. This will inform you that Pig'n Whistle Corporation will protect its exclusive rights under its agreement with you and will hold all parties interested liable for any invasion of its rights. If you attempt to violate this agreement in this area, legal action will be filed against you and any other participating parties to enjoin such breach. Please govern yourselves accordingly.

"Pig'n Whistle Corporation

By _____ O'Connor

Secretary''

legal action was necessary to enforce the contract with Masterson, Reddy and Nelson.

On April 13, Horney wrote plaintiffs at their New York office, informing them that his client intended to bring proceedings to restrain any breach of the contract. Plaintiffs consulted their New York attorneys, who advised them, in a lengthy written opinion, that they were under no obligation to Pig'n Whistle after May 2. Nelson sent a copy of the opinion to Savage, stating in a covering letter that plaintiffs would be governed by their lawyers' advice.

May 4, 1951, O'Connor sent a letter to Station KNBH, advising that Pig'n Whistle had the exclusive right to sponsor "Animal Fair" in Los Angeles, and stating that the corporation would consider any showing of kinescopes of the same or a similar program over KNBH as rendering valueless its $37,000 investment in the show and as a breach of contract on the part of Masterson, Reddy and Nelson. The sales manager of the station, one Norman, made a written offer to Pig'n Whistle to accept continued sponsorship of "Animal Fair" at a production cost of $900 a week, but the offer was refused.

On June 25, 1951, Pig'n Whistle filed an action against plaintiffs, as partners and individually, seeking $81,700 damages for breach of contract. In its amended complaint, which was verified by O'Connor as secretary of the corporation, Pig'n Whistle alleged: (1) On or about November 1, 1950, the parties entered into a contract which was partly oral and partly in writing. The contract provided that "Animal Fair" was to be produced and broadcast "for a cycle of 13 successive weeks and for further cycles of 13 weeks as long as plaintiff should desire to sponsor said show," and that Pig'n Whistle was to have "The exclusive right to sponsor the show named Animal Fair in the Los Angeles area as long as plaintiff should continue to sponsor the same." (2) Pig'n Whistle renewed the contract for a second 13-week cycle and during the 26 weeks of its sponsorship "Animal Fair" became a valuable advertising asset. (3) Pig'n Whistle notified Masterson, Reddy and Nelson of its desire to sponsor "Animal Fair" for a third 13-week cycle, but they failed and refused to broadcast the program under the sponsorship of Pig'n Whistle after the expiration of 26 weeks. (4) Pig'n Whistle's expenditure of $31,710 on "Animal Fair" has been rendered entirely valueless on account of this failure and refusal, and the corporation has been damaged in that amount. In a second cause of action, Pig'n Whistle sought

recovery of an additional $50,000 damages, representing loss of benefits to its advertising program.

Masterson, Reddy and Nelson answered, denying that they had agreed to give Pig'n Whistle the right to sponsor "Animal Fair" for so long as it desired to do so, and alleging that the written contract of November 1, 1950, granted Pig'n Whistle a single option to renew "Animal Fair" for a single additional 13-week cycle.

Trial of the action was to the court, which made findings and entered judgment in favor of Masterson, Reddy and Nelson.

In their complaint in the present action, plaintiffs allege that Savage and O'Connor were and are the sole officers and directors of Pig'n Whistle, and that the acts of the corporation were "instigated and caused to be done by said individual defendants and [were] done and committed pursuant to the direction and control of said individual defendants, and not otherwise." It is alleged that the former action was instituted wrongfully, maliciously and without probable cause, for the purpose of harassing plaintiffs and preventing them from performing their written contract with the Gardner Advertising Company. It is also alleged that Pig'n Whistle's averments respecting the November 1 agreement were false and defendants knew, or should have known, that they were false. Plaintiffs further allege that Pig'n Whistle's claim for $81,710 damage was false and was made in bad faith. The prayer is for recovery of (1) $8,341.29, representing legal and other expenses necessarily incurred by plaintiffs in defending the former action; (2) $60,000 damages for injury to plaintiffs' business, reputation and credit, and for their mental suffering and distress; (3) $150,000 exemplary damages. A second cause of action alleges a conspiracy on the part of defendants to prevent Masterson, Reddy and Nelson from performing the contract with Gardner.

The answer denies that O'Connor and Savage were the sole directors of Pig'n Whistle, denies the existence of a conspiracy, and denies that the former action was filed wrongfully, maliciously or without probable cause. It alleges that Pig'n Whistle brought the breach of contract action for the sole purpose of adjudicating a dispute between the parties.

The evidence at the trial consisted of the letters, documents and telegrams to which we have already referred, together with the testimony of various witnesses.

John Nelson testified that it was the intention of the partnership eventually to offer "Animal Fair" to a national

sponsor. Negotiations for the Pig'n Whistle contract were carried on solely with Horney. Horney never requested that his client be given the right to sponsor the program indefinitely. Nelson wrote his letter of December 20, 1950, after a conversation with Horney on or about that date. He told Horney that Masterson, Reddy and Nelson were trying to sell "Animal Fair" to an eastern sponsor and that he wanted a letter to show to prospective advertisers, setting forth the understanding of the parties that Pig'n Whistle had exclusive television rights in Los Angeles for 26 weeks but had no rights in "Animal Fair" after May 2, 1951; the letter would also serve to protect Pig'n Whistle against "the invasion" of the Los Angeles area by an eastern sponsor prior to May 2nd. Horney said it was a good idea, so Nelson prepared the letter, which was based on their conversation, and sent it to him, requesting him to return a signed copy. Horney promised to sign the copy or to have it signed by Savage, but he did not do so. The first time Nelson saw a copy of the letter with Horney's signature was at the trial of the former suit in 1954. On cross-examination, Nelson said that the purpose of the letter was "to protect them [Pig'n Whistle] after 26 weeks, and so on."

Nelson also testified that beginning in November, 1950, kinescopes of "Animal Fair" were made in the presence of Savage and Horney. The witness told Horney that the films were to be shown to prospective eastern sponsors and the latter's only objection was that he did not receive an adequate screen credit. Around February 10, 1951, Nelson telephoned Horney, informing him of the potential sale of "Animal Fair" to the Ralston Purina Company. Nelson assured him that his client would be protected until May 2nd. He asked Horney to inquire of Savage whether the two programs might run concurrently in Los Angeles for the last six or seven weeks of the Pig'n Whistle contract and Horney replied that "he didn't see how there possibly could be any objection." The witness was not sure whether he had told Horney of the clause in the Gardner contract providing that "Your Pet Parade" would not be shown in Los Angeles until May 2nd.

Nelson testified further that within 30 days or so after the filing of the former suit Gardner cancelled its contract with Masterson, Reddy & Nelson. The partnership incurred legal and other necessary expenses totalling $8,341.29 in defending the suit. Had Gardner not cancelled "Your Pet

Parade'', the partnership would have made a profit of $50,000 during the following 26 weeks; plaintiffs had made a profit of over $13,000 while ''Your Pet Parade'' was on the air. The program was worth $50,000 prior to cancellation, but was valueless thereafter. Plaintiffs' business reputation was clouded by the lawsuit and the partnership dissolved in 1954 due to dissension among the partners.

John Masterson testified by deposition that he attempted to resell ''Your Pet Parade'' following cancellation by Gardner, but was unable to do so. He assumed that Nelson had told Horney of the clause in the Gardner contract to which we have referred.

Roland Martini, Vice President of Gardner, testified by deposition that his client, the Ralston Purina Company, was disturbed by the Pig'n Whistle litigation and that cancellation of the contract was at least partly due to the lawsuit. Martini and two other advertising agents, a Mr. Tatum and a Mr. Wolfe, testified on behalf of plaintiffs that Masterson, Reddy and Nelson had had an excellent reputation for honesty in the television industry prior to June 25, 1951, but that their reputation was affected adversely by the suit.

O'Connor and Savage were called by plaintiffs pursuant to section 2055 of the Code of Civil Procedure. Savage and his wife owned approximately 60 per cent of the stock of Pig'n Whistle and O'Connor owned 5,000 shares. O'Connor was also attorney for the corporation, and had been a member of the board of directors and secretary-treasurer for eight years. Savage was chairman of the board of directors. It was stipulated that O'Connor and Savage ''had a practical working control of Pig'n Whistle during the spring of 1951.''

Upon being questioned by plaintiffs' counsel as to his knowledge of the written order dated November 1, 1950, O'Connor at first stated that he did not see the order until the trial of the former suit in July, 1954. Upon being reminded that the order had been introduced as an exhibit, in his presence, at a deposition of Savage taken in January, 1952, the witness admitted seeing it at that time. When shown his own letter dated April 2, 1951, O'Connor denied having seen the order of November 1, 1950, before writing the letter. Counsel for appellants then offered to stipulate that O'Connor had the order in his file as early as January 18, 1951, and O'Connor admitted reading it on that date. O'Connor stated that Horney had consulted him regarding the telegram of February 16, 1951, and he had advised that

it should be sent. He stated his belief that part of the November 1, 1950, agreement consisted of a verbal understanding, confirmed by Nelson's letter of December 20th, that Pig'n Whistle should have an indefinite number of successive options to renew the program. He admitted acting in his capacity as an officer of Pig'n Whistle at all times from January through June, 1951.

While being examined by counsel for plaintiffs, Savage admitted knowing of the publicity regarding sale of ''Animal Fair'' to a national sponsor at the time Pig'n Whistle authorized renewal of the original order. He stated that from November, 1950, through April, 1951, Pig'n Whistle sustained business losses in excess of $64,000; the corporation made profits of only $29,000, all in December, 1950. In April, 1951, the last month of broadcasting, Pig'n Whistle lost over $22,000, while in April, 1950, it made a profit of nearly $2,000.

When asked whether he harbored any feeling of ill will against plaintiffs, Savage replied that he did not. He stated: ''I don't suppose that he [Nelson] had mistreated me, but I would not treat anybody like he treated me'' and ''If Masterson would have been connected with this deal, we would have had no difficulty.'' He admitted being asked at a deposition hearing whether he knew that when the contractual period expires, a sponsor has no further rights in a television program, and having answered: ''Not exactly, no. There is a little honor among thieves.'' The witness stated that he was not referring to Masterson, Reddy and Nelson as thieves.

O'Connor also testified briefly for the defense. He stated that at the time he prepared the complaint in the former action he believed the suit had merit and believed that plaintiffs had made a contract with Ad Associates for the benefit of Pig'n Whistle under which the latter had the exclusive right to sponsor ''Animal Fair'' so long as it desired to do so. He had no knowledge of the clause in the Gardner agreement excluding ''Your Pet Parade'' from Los Angeles. He believed Pig'n Whistle had suffered $81,700 damages as the result of plaintiffs' refusal to continue the program for a third cycle. His only object in filing suit was to recover the damages to which he thought Pig'n Whistle was entitled.

At the close of the evidence, appellants made a motion for a directed verdict; the motion was denied by the court. As we have said, plaintiffs were awarded damages in the sum of $48,341.29. The jury made no award of punitive damages.

Appellants made a motion for judgment notwithstanding the verdict and the motion was likewise denied.

■ In order to maintain an action for malicious prosecution, plaintiffs were required to prove (1) a favorable termination of the former suit; (2) want of probable cause; and (3) malice. (*Jaffe* v. *Stone,* 18 Cal.2d 146 [114 P.2d 335, 135 A.L.R. 775].)

In discussing the questions presented on the appeal, we will first consider appellants' contention that their motions for a directed verdict and for judgment notwithstanding the verdict should have been granted for the reason that the evidence established probable cause as a matter of law.

■ Probable cause is synonymous with reasonable cause.
■ One who commences a civil suit acts upon probable cause if he has an honest belief, founded upon facts sufficiently strong to justify his belief, that grounds exist for the proceeding. (*Hudson* v. *Zumwalt,* 64 Cal.App.2d 866, 872 [149 P.2d 457].) ■ Probable cause has been defined as "a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true." (*Centers* v. *Dollar Markets,* 99 Cal.App.2d 534, 540 [222 P.2d 136].) And, where the circumstances are such as to satisfy a reasonable man that there is no basis for suit, probable cause is lacking. (*Metzenbaum* v. *Metzenbaum,* 121 Cal. App.2d 64, 68 [262 P.2d 596].)

■ The fact that the lawsuit was unsuccessful would not, standing alone, justify an inference that it was brought without probable cause. (*Haydel* v. *Morton,* 8 Cal.App.2d 730, 733 [48 P.2d 709], and cases cited; *Lotts* v. *Whitworth,* 76 Cal.App.2d 601, 605 [173 P.2d 823].) Pig'n Whistle acted upon probable cause if Savage and O'Connor believed, in good faith, that the corporation had grounds for a lawsuit against Masterson, Reddy and Nelson and their belief was one that could reasonably have been entertained. In other words, there was probable cause if the facts known to O'Connor and Savage warranted them in believing that Pig'n Whistle had a contract with plaintiffs to sponsor "Animal Fair" for an indefinite series of 13-week cycles, that plaintiffs were guilty of a breach of contract, and that Pig'n Whistle thereby sustained $81,700 damages.

The court gave a number of instructions defining probable cause explaining the elements of probable cause. It is not contended that the instructions which were given contained

misleading or inapplicable statements of the law. Appellants argue, in this connection, that there was no conflict in the evidence regarding probable cause and that under well established rules the question should not have been submitted to the jury. Plaintiffs argue, on the other hand, that appellants waived their right to complain of the giving of instructions on probable cause by requesting instructions of their own. They also argue that as there was a conflict in the evidence relating to probable cause, the question was properly left for the determination of the jury.

We find no substance to plaintiffs' contention that there was a waiver. In arguing his motion for a directed verdict, counsel for appellants strenuously maintained that the jury should not be permitted to pass upon the issue of probable cause. After the court stated that it intended to submit the matter to the jury, defense counsel offered a number of instructions on the subject, some of which were given and some refused. The course adopted by counsel did not constitute a waiver of the right to claim error. It is settled that where a party is unable to induce the court to accept his view of the law, the fact that he requests instructions in accordance with the court's ruling does not preclude him from assigning error. (*Dowd* v. *Atlas Taxicab etc. Co.,* 69 Cal.App. 9, 14 [230 P. 958] ; *Williamson* v. *Pacific Greyhound Lines,* 93 Cal. App.2d 484, 488 [209 P.2d 146].)

The rules relating to the determination of probable cause are well stated in the leading case of *Ball* v. *Rawles,* 93 Cal. 222, at page 227 [28 P. 937, 27 Am.St.Rep. 174] : "In order to maintain an action for malicious prosecution, the plaintiff must establish malice on the part of the defendant, and also a want of probable cause. Malice is always a question of fact for the jury, but whether the defendant had or had not probable cause for instituting the prosecution is always a matter of law to be determined by the court. If the facts upon which the defendant acted are undisputed, the court, according as it shall be the opinion that they constituted probable cause or not, either will order a nonsuit (or direct a verdict for the defendant), or it will submit the other issues to the jury; but whether admitted or disputed, the question is still one of law to be determined by the court from the facts established in the case. If the facts are controverted, they must be passed upon by the jury before the court can determine the issue of probable cause; but the question of probable cause can never be left to the determination of the jury."

■ Thus, if there is no dispute concerning the existence of the facts relied on to establish want of probable cause, the court must then determine as a matter of law whether such facts warrant an inference of want of probable cause, but where the evidence bearing on the question of probable cause is in conflict, it is for the jury to determine whether facts exist which warrant or reject an inference of probable cause. (*Torney* v. *Petersen,* 109 Cal.App. 560, 565 [293 P. 653]; *Singleton* v. *Singleton,* 68 Cal.App.2d 681, 691 [157 P.2d 886]; *Siffert* v. *McDowell,* 103 Cal.App.2d 373, 377 [229 P.2d 388]; *Bernstein* v. *Maimes,* 126 Cal.App.2d 468, 477 [272 P.2d 529].)

■ We agree with appellants that there were no disputed issues of fact to be resolved by the jury on this phase of the case. There was no dispute as to what had been said and done by the parties nor as to the facts upon which Pig'n Whistle relied in bringing suit. The question for decision was whether, upon the uncontroverted evidence, Savage and O'Connor had reason to believe the allegations of their complaint were true. That was a question of law, and it was error to submit it to the jury.

But no harm can have resulted from the error, for the evidence established as a matter of law that there was no probable cause for suit. It was an inescapable conclusion from the evidence that the officers of Pig'n Whistle had no reasonable grounds for believing that the corporation had an option to sponsor the program for a third cycle of broadcasts. The agreement of the parties was contained in Horney's order of November 1, 1950, and Nelson's letter of December 20th. Neither document lends any support to a view that Pig'n Whistle was to have an indefinite series of renewals. The order expressly provides for but a single option, and O'Connor was aware of its terms at least five months before Pig'n Whistle brought suit. The resolution of the board of directors of October 31, 1950, expressly stated that the contract should have a provision ''giving the corporation preferential right for renewal for additional thirteen weeks on the same station, for the same hour and program.'' Horney's order exercising the option for a second 13-week series did not assert a right to a third series or an indefinite number. It was no more than a request for an option for a third series. Nor can Nelson's letter of December 20 be interpreted as providing for more than one option. It is true that O'Connor testified to his belief that the letter confirmed an earlier verbal agreement

between Horney and Nelson, but no basis for such a belief was disclosed in his testimony. O'Connor had no personal knowledge of the conversations between Nelson and Horney. Nelson testified that nothing was said to him about continuation of "Animal Fair" beyond May 2, 1951. There was no evidence to the contrary. Horney was not called to testify as to his negotiations with Nelson. If his testimony was not available, appellants should have disclosed that fact. It is to be presumed that his testimony, if given, would have been adverse to appellants. (Code Civ. Proc., § 1963, subd. 5; *Breland* v. *Traylor Eng. etc. Co.*, 52 Cal.App.2d 415, 426 [126 P.2d 455]; *Gonzalez* v. *Southern Pac. Co.*, 157 Cal.App.2d 733, 740 [321 P.2d 865].) It could only be assumed that if Horney had testified he would not have contradicted Nelson's testimony. The fact, if it be a fact, that neither Horney nor Pig'n' Whistle was informed that "Your Pet Parade" was not to be shown in Los Angeles prior to May 2 would furnish no rational basis for an inference that Pig'n Whistle's rights were to extend beyond that date. And in view of the undisputed fact that Pig'n Whistle suffered losses approximating $35,000 during the 26 weeks of broadcasting, it is difficult to see a basis for the claim that it was greatly damaged through loss of "Animal Fair."

The next contention to be considered is that there was no evidence that appellants were actuated by malice. The argument is without merit.

In an action for malicious prosecution, the word "malice" denotes an improper motive, and malice is sufficiently established if it appears that the former suit was commenced in bad faith to vex, annoy or harass the adverse party. (*Centers* v. *Dollar Markets, supra*, 99 Cal.App.2d 534, 541.) Whether malice existed was a question of fact to be resolved by the jury from all the circumstances in evidence. (*Grove* v. *Purity Stores, Ltd.*, 153 Cal.App.2d 234, 241 [314 P.2d 543].) We have already stated the evidence at some length and we need not repeat it. The jury could have inferred malice from the want of probable cause. (*Singleton* v. *Singleton, supra*, 68 Cal.App.2d 681, 696, and cases cited.) It is to be presumed that the jury drew that inference. To be sure, the issue should not have been submitted to the jury, but having determined that there was no probable cause, the jury's approach to the issue of malice was the same as it would have been had the court made that decision and sub-

mitted to the jury only the issues of malice and damages. Inasmuch as the jury could, and evidently did infer malice from want of probable cause, we cannot say, as a matter of law, that there was no evidence of malice. It was for the jury to determine whether an inference of malice should be drawn from the absence of probable cause. It is not our function to weigh that inference against other justifiable inferences or the evidence tending to prove absence of malice. (*Anderson* v. *Los Angeles Transfer Co.*, 170 Cal. 66 [148 P. 212]; *Mah See* v. *North American Acc. Ins. Co.*, 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123]; *Estate of Gillett*, 73 Cal.App.2d 588, 598 [166 P.2d 870].)

The final contention to be considered is an argument on behalf of O'Connor that he acted in his capacity of attorney for Pig'n Whistle, and on behalf of Pig'n Whistle and Savage that they relied in good faith on O'Connor's advice.

Reliance upon the advice of counsel, provided it is given in good faith and is based upon a full and fair statement of the facts by the client, may afford the latter a complete defense to an action for malicious prosecution. (32 Cal.Jur. 2d 74.) But it is an affirmative defense. It may be shown under a general denial in the answer (*Walker* v. *Jensen,* 95 Cal.App.2d 269, 275 [212 P.2d 569], and cases cited), but the burden of establishing it is upon the defendant. (*Diggs* v. *Arnold Bros., Inc.*, 132 Cal.App. 518, 523 [23 P.2d 71].)

No instructions were requested by Savage and Pig'n Whistle relating to this theory of the case. The argument is obviously an afterthought, and a sufficient answer to it is that Savage did not testify that he relied upon legal advice given by O'Connor in deciding to sue.

As to O'Connor, it is of course true that an attorney may not be held liable in damages for malicious prosecution where, upon facts stated to him by his client, he advises the latter erroneously that he has a good cause of action. (*Murdock* v. *Gerth*, 65 Cal.App.2d 170, 179 [150 P.2d 489].) However, O'Connor owned stock in Pig'n Whistle and it was stipulated that he and Savage were in control of the corporation's affairs. He did not seek any instructions upon the theory that he acted only as counsel for Pig'n Whistle and it was not a necessary conclusion from the evidence that he acted in that capacity rather than as secretary of Pig'n Whistle. Moreover, the implied finding

that he was actuated by malice renders it immaterial whether he acted in one capacity or the other.

The judgment and order appealed from are affirmed.

Wood (Parker), J., and Patrosso, J. pro tem.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 13, 1958.

*Assigned by Chairman of Judicial Council.